******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

## STACY SMITH *v.* COMMISSIONER OF CORRECTION
### (AC 47425)

Cradle, C. J., and Alvord and Wilson, Js.

*Syllabus*

The petitioner, who had been convicted of several crimes, appealed, on the granting of certification, from the habeas court's judgment denying his petition for a writ of habeas corpus. He claimed that the court improperly rejected his claim that his criminal trial counsel rendered ineffective assistance when advising him with respect to a pretrial plea offer from the state. *Held*:

The habeas court properly determined that the petitioner's criminal trial counsel did not render deficient performance in advising the petitioner regarding the state's plea offer, as the court credited counsel's testimony that he advised the petitioner about the offer, including that it contained a right to argue for a lesser sentence, which he explained to the petitioner, as well as the elements of the offenses at issue, the state's evidence and the maximum penalties the petitioner faced, and the petitioner did not indicate to the court or his counsel that he did not understand what a right to argue meant.

Argued March 26—officially released September 2, 2025

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Bhatt, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*J. Patten Brown III*, assigned counsel, for the appellant (petitioner).

*Rebecca Z. Oestreicher*, special deputy assistant state's attorney, with whom, on the brief, were *Sharmese L. Hodge*, state's attorney, and *Elizabeth M. Moseley*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

PER CURIAM. The petitioner, Stacy Smith, appeals, following the granting of his petition for certification to appeal, from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the habeas court improperly rejected his claim that his trial counsel had rendered ineffective assistance in advising him with respect to a pretrial plea offer from the state. We affirm the judgment of the habeas court.

On the basis of the evidence presented at the petitioner's criminal trial, the jury reasonably could have found the following facts, as set forth by this court in the petitioner's direct appeal. See *State* v. *Smith*, 174 Conn. App. 172, 166 A.3d 691, cert. denied, 327 Conn. 910, 170 A.3d 680 (2017). "The charged events occurred between October, 2007, and October, 2009, when the victim[1] was thirteen, fourteen and fifteen years old. At that time, she lived with her mother, M, two older brothers, and a younger sister. Until the end of 2009, the victim's family socialized 'almost every weekend' with D, who was the victim's godmother and M's best friend, and D's sons. In 2006, the victim met the [petitioner] for the first time at a Dunkin' Donuts store and learned that he was the father of D's oldest son. The [petitioner] was thirty-seven or thirty-eight years old at the time, recently had finished serving a prison sentence for federal narcotics violations, and was living in a halfway house and working at Dunkin' Donuts. Shortly thereafter, the [petitioner] and D resumed their previous relationship, and, in the winter of 2007, the [petitioner] moved into D's East Hartford home.

---

[1] "In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e." *State* v. *Smith*, supra, 174 Conn. App. 174 n.1.

"In the summers of 2007, 2008 and 2009, the victim and her family regularly attended get-togethers at D's home with D, her sons, and the [petitioner]. During that time, the victim also frequently babysat for D's younger son at D's house. On those occasions, the [petitioner] would often be present. The [petitioner's] inappropriate behavior toward the victim started in 2007, when the victim was socializing with D's family and babysitting at D's house. Specifically, between 2007 and 2008, the [petitioner] began talking to the victim about sex, he would caress her calf while they were watching a movie, and he would show her 'in his phone . . . other girls he was messing with other than [D], telling [her] things that he would do with them and . . . what [she] should do with other guys if [she] was dating someone.'

"In 2008, the [petitioner] began kissing and touching the victim while she was babysitting or attending social gatherings at D's house. The [petitioner] put his fingers in her vagina and touched her breasts or buttocks multiple times between October, 2008 and October, 2009. On one occasion in the summer of 2008, the [petitioner] performed oral sex on the victim while she was babysitting for D. Although the victim asked him to stop and tried to push him off of her, he continued for about thirty seconds and stopped when he heard D's car pull into the driveway. On several occasions when the [petitioner] was kissing or touching the victim, he would unzip his pants and pull out his penis. Although the [petitioner] asked the victim to perform oral sex on him two or three times, she refused, and he 'laughed it off.'

"In 2010, the victim's family stopped socializing with D's family because the [petitioner] 'was getting abusive' with D, and M did not want her daughters 'to be around all that arguing.' The last time the victim saw the [petitioner] was at a Fourth of July party at D's house in

2010, at which the [petitioner] tried to pull the victim into a room and to kiss her, but she was able to escape.

"In January, 2011, the victim told M about the [petitioner's] actions. The next day, M took the victim to the East Hartford Police Department, where they met with Officer Daniel Zaleski. Zaleski spoke with the victim separately for about twenty minutes, during which time the victim disclosed the pertinent details about the [petitioner's] repeated sexual conduct toward her. Zaleski then referred the case to a juvenile investigator, Detective Samuel Kelsey, who investigated sexual assaults involving minors, and reported the matter to the Department of Children and Families (department).

"On February 1, 2011, after receiving a phone call from Kelsey requesting to speak with him about the allegations against him, the [petitioner] voluntarily went to the East Hartford Police Department and gave a statement. According to Kelsey, the [petitioner] admitted to having had 'close contact' with the victim 'in an inappropriate nature, [such] as touching her breast and vagina.' Specifically, during this interview with Kelsey, the [petitioner] 'said at no time did he have sex with her; he said he was under the influence of alcohol and he can't remember all the events but he does admit having made contact with her; he said he was very sorry and that he would like to make amends in any way deemed necessary, this is not him . . . but that's no excuse.' After Kelsey reduced the [petitioner's] statement to writing, the [petitioner] initialed and signed it. The entire interview lasted approximately forty minutes.

"After the interview, in the lobby of the police station, the [petitioner] was met by Betzalda Torres, an investigator employed by the department who was investigating the alleged physical neglect and sexual abuse of the victim by the [petitioner]. After Torres reviewed the

allegations against [the petitioner] involving the physical neglect and sexual abuse of the victim, for the purposes of the investigation by the department, the [petitioner] 'basically, confirmed that what [the victim] said was correct, did not deny it, and . . . [he] was feeling apologetic to the family for what he ha[d] done.' The [petitioner] told Torres that he had been sexually inappropriate with the victim and that he had 'many' discussions with her regarding sex and her virginity. During this interview, the [petitioner] was not specific as to the details of the actual acts he performed, but he explained that his alcohol and drug use played a role and he 'took full responsibility' for being 'sexually inappropriate toward [the victim].' " Id., 174–77.

The petitioner subsequently was arrested. Id., 177. The petitioner was represented at his criminal trial by Attorney R. Bruce Lorenzen. Prior to trial, the state made a plea offer to the petitioner. The state offered a five year sentence of incarceration, with a right to argue for a lesser sentence, in exchange for a guilty plea to sexual assault.[2] The case was continued several times from December, 2011, through March, 2012, for the petitioner to consider the plea offer. During this period, the trial court informed the petitioner twice that the plea offer allowed the petitioner the right to argue for a lesser sentence. In March, 2012, the petitioner rejected the plea offer, and the trial court, *Alexander, J.*, conducted a canvass of the petitioner.[3] The case then proceeded to trial.

---

[2] The record is unclear regarding the degree of sexual assault to which the petitioner would have pleaded guilty under the terms of the plea offer.

[3] The following colloquy occurred between the trial court and the petitioner:

"The Court: . . . This was down for accept or reject on a plea agreement that did give [the petitioner] a right to argue for a lesser sentence on some reduced charges. Did he want to accept it or did he want to reject it.

"[Lorenzen]: Your Honor, we'd respectfully decline the offer.

"The Court: And you have gone over that pretrial offer with your attorney. Is that correct?

"[The Petitioner]: Correct.

"[F]ollowing a jury trial, [the petitioner] was convicted of two counts of sexual assault in the second degree, four counts of risk of injury to a child, and one count of sexual assault in the fourth degree. The [trial] court, *Dewey, J.*, subsequently sentenced the [petitioner] to a total effective sentence of thirty years incarceration, followed by five years of special parole." Id., 177. The petitioner's conviction was affirmed on direct appeal. Id., 174.

Thereafter, the petitioner filed a petition for a writ of habeas corpus, alleging that Lorenzen had rendered ineffective assistance of counsel. After a trial on the petitioner's single count, amended petition, the habeas court, *Bhatt, J.*, denied the petition on the ground that the petitioner had not proven deficient performance or prejudice with respect to his allegations that Lorenzen failed to advise the petitioner regarding his plea offer.[4] The habeas court granted the petitioner's petition for certification to appeal. This appeal followed.

We first set forth our standard of review. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Internal quotation marks omitted.) *Jamison* v. *Commissioner of Correction*, 167 Conn. App. 312, 319, 143 A.3d 1136, cert. denied, 323 Conn. 934, 151 A.3d 383 (2016).

---

"The Court: And you understand that when the case goes to trial the state can proceed on the original charges, which may have higher penalties after trial. You understand all that?

"[The Petitioner]: Um-hum.

"The Court: Yes? Okay."

[4] The habeas court also rejected the petitioner's claim that Lorenzen had rendered deficient performance with respect to alleged failures to present evidence of coercive police tactics and to locate favorable witnesses. The petitioner does not challenge those determinations on appeal.

"The petitioner bears the burden of proving ineffective assistance of counsel under the well established standard of *Strickland* v. *Washington*, 466 U.S. 668, 687–88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). . . . In cases . . . involving plea negotiations, to prevail on a claim of ineffective assistance of counsel the petitioner must establish that (1) counsel's performance was deficient, and (2) there was a reasonable probability that—but for the deficient performance—the petitioner would have accepted the plea offer, and that the trial court would have assented to the plea offer. . . . An ineffective assistance of counsel claim will succeed only if both prongs [of *Strickland*] are satisfied. . . . It is axiomatic that courts may decide against a petitioner on either prong [of the *Strickland* test], whichever is easier." (Citations omitted; internal quotation marks omitted.) *Bonds* v. *Commissioner of Correction*, 223 Conn. App. 645, 654–55, 309 A.3d 411, cert. denied, 348 Conn. 956, 310 A.3d 380 (2024).

On appeal, the petitioner claims that the habeas court improperly rejected his ineffective assistance of counsel claim. Specifically, the petitioner contends that the court improperly rejected his claim that Lorenzen, when advising the petitioner on the state's plea offer, failed to explain the elements of the charged offenses, the state's evidence against him, the petitioner's potential exposure, and the petitioner's right to argue for a lesser sentence. The respondent, the Commissioner of Correction, argues that the court properly concluded that the petitioner had failed to demonstrate that Lorenzen rendered deficient performance. We agree with the respondent.

At the habeas trial, the petitioner and Lorenzen testified. The habeas court credited Lorenzen's testimony with respect to his discussions with the petitioner about the plea offer. Lorenzen testified that he had advised the petitioner with respect to the elements of the

offenses, the state's evidence, and the petitioner's exposure to the maximum penalties.[5] Lorenzen told the petitioner, as he would with his other clients, that the plea offer included the right to argue.[6] Relatedly, Lorenzen advised the petitioner about how the sentencing judge viewed the right to argue and that there was a possibility of receiving a sentence of less than five years of incarceration.

On the basis of its factual findings, the habeas court determined that the petitioner had not proven that Lorenzen engaged in deficient performance with respect to advising him about the plea offer. In crediting Lorenzen's testimony, the court found that Lorenzen's performance was not deficient because "he advised [the petitioner] of the offer, including the fact that it contained a right to argue for less—and also advised him of what that meant—as well as the elements of the offense, the state's evidence and the penalties [the petitioner] was exposed to." In addition, the court further supported its finding that Lorenzen had discussed what the right to argue meant by crediting Lorenzen's testimony that he had informed the petitioner of the presiding judge's position on the right to argue. The habeas court found

[5] During the habeas trial, Lorenzen testified about his advice to the petitioner, which included meeting with the petitioner to review the plea offer; discussing the plea offer more than once with him; and requesting continuances for the petitioner to consider the plea offer, because the petitioner was reluctant to accept the plea offer. Lorenzen further testified that he did not "have a recollection of a verbatim discussion with [the petitioner]" but that he would have discussed, as he would have with other clients, the allegations, evidence, defenses, and penalties with the petitioner. Relatedly, Lorenzen testified that it was his practice to advise clients of the risks of going to trial; he told the petitioner that the plea was "the very safe play" and it "was likely to work out to his detriment to go to trial."

[6] Lorenzen testified that he had advised the petitioner that "[t]his is it," that the petitioner would have to go before a judge to say whether he was taking the plea offer, and that there may be a possibility of entering a plea pursuant to a plea agreement with the state if he changed his mind later, but that there was no guarantee.

that "[s]uch a conversation would only have been necessary if [Lorenzen] and [the petitioner] were discussing what a right to argue for less meant."

The habeas court also made other findings that supported its determination that Lorenzen did not perform deficiently. First, the court found that the petitioner did not indicate to Lorenzen that he did not understand what a right to argue meant. Second, the court referenced two separate occasions when the trial court stated in the presence of the petitioner that the plea offer called for a right to argue[7] and two occasions when the trial court stated that the state was modifying the plea offer slightly.[8] The habeas court found that, during those four hearings, the petitioner never stated to the trial court that he did not know that his plea offer included a right to argue or that he did not understand what the right to argue meant.

On the basis of our review of the record, we conclude that the habeas court properly determined that Lorenzen's advice with respect to the plea offer was not deficient. The petitioner does not challenge any of the

---

[7] During a December 15, 2011 hearing, the trial court stated to the petitioner: "[T]here was some discussion of a plea agreement, and you have to decide whether you want to take a plea agreement or whether you want to have a trial. It did involve the change of charge by the state with a lesser sentence being argued for, and your next court date to decide is . . . January 19 [2012]. [Your counsel] will see you after court." During a March 29, 2012 hearing, the trial court stated to the petitioner: "[Come] on up, sir. This was down for accept or reject on a plea agreement that did give [the petitioner] a right to argue for a lesser sentence on some reduced charges."

[8] On January 19, 2012, the trial court stated: "[T]here's some additional information. Today was down for accept or reject. But the parties need to investigate it a little further. It may change your offer. . . . So, I'm going to give them until February 16 [2012] to see if what was indicated as the offer is going to stay or if it's going to change to something—it looks like more in your benefit."

On February 16, 2012, the trial court indicated that the "state modified the offer slightly or in some ways—at least as it relates to the amount of time that you could be exposed to as a maximum. You have to go over . . . whether you want the plea agreement, whether you want the trial."

court's underlying factual findings as clearly erroneous. Instead, he directs this court to his own testimony at the habeas trial, which the habeas court did not credit. See *Bridges* v. *Commissioner of Correction*, 169 Conn. App. 742, 749–50, 152 A.3d 71 (2016) ("[T]his court does not retry the case or evaluate the credibility of the witnesses. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Internal quotation marks omitted.)), cert. denied, 324 Conn. 917, 154 A.3d 1008 (2017). The petitioner did not demonstrate that Lorenzen's advice to the petitioner " 'fell below an objective standard of reasonableness.' " *Franko* v. *Commissioner of Correction*, 165 Conn. App. 505, 518, 139 A.3d 798 (2016). We, therefore, agree with the habeas court's conclusion that the petitioner has not proven deficient performance.[9]

The judgment is affirmed.

---

[9] Because we have decided the petitioner's claim on the basis of the performance prong of *Strickland*, we need not discuss the prejudice prong. See *Bonds* v. *Commissioner of Correction*, supra, 223 Conn. App. 654–55 ("[i]t is axiomatic that courts may decide against a petitioner on either prong [of the *Strickland* test], whichever is easier").